# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

TY SHANABERG,

    **Plaintiff,**

  v.

LICKING COUNTY, *et al.*,

    **Defendants.**

Case No. 2:16-cv-1209
JUDGE GEORGE C. SMITH
Magistrate Judge Vascura

## OPINION AND ORDER

This matter is before the Court upon Defendants Licking County, Licking County Sheriff's Office, Coshocton County, Coshocton County Sheriff's Office, Randy Thorp, Michael Zwiebel, Brian Stetson, Jessica Mills, and Timothy Rogers' (collectively "Defendants") Motion for Summary Judgment (Doc. 54) and Plaintiff Ty Shanaberg's Motion for Summary Judgment (Doc. 57). The motions are fully briefed and ripe for review. For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED,** and Plaintiff's Motion for Summary Judgment is **DENIED**.

    **I.**    **FACTUAL BACKGROUND**

At the time the incidents giving rise to this case occurred, Plaintiff Ty Shanaberg was a resident of Coshocton County, Ohio. Defendants Licking County and Coshocton County are political subdivisions in the State of Ohio. The Coshocton County Sheriff's Office is the chief law enforcement agency of Coshocton County, Ohio and Defendant Timothy Rogers is the Sheriff. The Licking County Sheriff's Office is the chief law enforcement agency of Licking County, Ohio.

Defendant Randy Thorp is the Licking County Sheriff and Defendants Brian Stetson, Jessica Mills, and Michael Zwiebel were deputies for Licking County. (*See generally* Doc. 1, Compl.).

Plaintiff owned a 2003 red Ford Ranger pick-up truck. On or about June 20, 2014, Plaintiff had his truck stolen from his home and he notified the Coshocton County Sheriff's Office. (Doc. 1, Compl. ¶¶ 18–19; Doc. 53-1, Pl.'s Dep. at 9). Approximately a week later, Plaintiff was notified that his truck was recovered in Newark, Ohio, and he retrieved it from the Licking County impound lot. (Doc. 1, Compl. ¶¶ 20–21; Doc. 53-1, Pl.'s Dep. at 11).

On January 2, 2015, Plaintiff had been working at Hope Timber in Newark, splitting wood for approximately eight hours. Plaintiff loaded the wood on his truck and stopped for dinner and a couple beers on his way home. (Doc. 53-1, Pl.'s Dep. at 13–14). After dinner, Plaintiff drove home. On his way, he described that his truck was hard to control. "I may have been swerving a little bit because of the load of wood, but I was not in the oncoming lanes or off the other side of the road." (*Id*. at 17). At some point, Plaintiff pulled off the road because he thought something happened with the load. He described, "I either thought I lost a piece of wood or heard something pop or something. So I decided to check it out." (*Id*. at 19). Plaintiff ultimately determined it must have been the extra weight from the wood in his truck and he was returning to the truck when he noticed police lights and sirens turning down the dirt road he was on. (Doc. 1, Compl. ¶¶ 26-28; Pl.'s Dep. at 19-20).

Licking County Sheriff's Deputies Stetson, Mills, and Zwiebel were dispatched to State Route 79 and Cedar Run Road in Licking County on the suspicion of a drunk driver. A Jeremiah Hogan had called to report a person driving a red Ford Ranger was driving erratically, including swerving into oncoming lanes multiple times, driving in the opposite lane, almost hitting an oncoming vehicle and almost hitting a guard rail. (*See* Doc. 54-1, Incident Report, included with

Green Aff., attached as Ex. A to Defs.' Mot. for Summ. J.). The Dispatch officer taking the call ran the license plate and the vehicle came back as stolen by Brandon Scott Powell, who should be considered armed and dangerous. (*Id.*). Dispatch also notified the officers in pursuit that the caller, Hogan, was following the truck and updating the location and activities of the driver. (*Id.*). Deputy Steton's police cruiser was equipped with video and audio recording devices. The recordings have been submitted to the Court. (*See* Doc. 55).

The officers pulled onto the same dirt road as Plaintiff and got out of their cruisers. Deputy Stetson immediately ordered Plaintiff to get down on the ground twice. Plaintiff got on his knees with his hands in the air. Plaintiff repeatedly asked, "what did I do?". The deputies approached Plaintiff and ordered him to get on his belly. Plaintiff refused and stated at least five times that he would not comply and continued to ask, "what did I do?". Deputy Stetson said, "put your belly on the ground or you're going to get tased" and Plaintiff yelled in response, "what did I do" and "what the fuck did I do." Plaintiff was also verbally resisting, responding "NO" when ordered to get down on the ground. (Doc. 55, CD of Deputy Stetson's Cruiser Video at 20:31:30—20:31:56 and 20:47:24–20:47:51).

After repeated warnings, Deputy Stetson deployed his taser on Plaintiff and he then fell forward onto the dirt road. Deputies Mills and Zwiebel handcuffed him. Plaintiff was then given a safety pat-down for weapons. (*Id.* at 20:47:51–20:50:15; Green Aff. ¶ 15). Deputies Mills and Zwiebel walked Plaintiff to the cruiser and observed that he smelled strongly of alcohol, had glassy eyes, and had a hard time maintaining his balance. (Doc. 54-1, Green Aff. Ex. B). The EMS was called to treat Plaintiff for any injuries he may have sustained as a result of being tased, however, Plaintiff refused treatment while en route to Licking Memorial Hospital and while at the hospital. He even pulled the taser barbs out himself. (*Id.*; Doc. 53-1, Pl.'s Dep. at 25–27).

Shortly after the incident, Deputy Stetson and Licking County Dispatch, realized that Plaintiff was not the suspected car thief, but actually the owner of the truck. Defendants acknowledge that the report of the stolen red Ford Ranger was cleared from LEADS and then mistakenly reentered the stolen vehicle back into the system shortly after the vehicle was recovered. (Doc. 54-5, Kobel Aff. ¶¶ 5-7).

Although Plaintiff was not a suspected car thief as originally believed, he was charged with two counts of Operating a Motor Vehicle while Impaired, in violation of Ohio Revised Code Sections 4511.19(A)(1)(a) and 4511.19(A)(2). (Doc. 54-1, Green Aff. ¶ 19, Ex. F). Plaintiff ultimately pled guilty to Obstructing Official Business in exchange for dismissal of the OVI charges. (Doc. 53-1, Pl.'s Dep. at 32).

Plaintiff initiated this case on December 29, 2016. He asserts the following claims under 42 U.S.C. § 1983: Count I – violation of his civil rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, including his right to be free from unreasonable searches and seizures, the right to due process of law, the right to be free of the use of excessive force, the right to be free from false arrest, and the right to just compensation for taking of property (Doc. 1, Compl. ¶ 57); Count II – failure to implement appropriate policies, customs, and practices; Count III – use of excessive force; Count IV – false arrest; Count V – deprivation of property without due process of law; and Counts VI – X for the same claims asserted above brought pursuant to the Ohio Constitution; and finally Counts XI—XIV for false imprisonment, negligence, negligent supervision, assault and battery, conversion, intentional infliction of emotional distress, and negligent infliction of emotional distress in violation of Ohio Common law.

## II. STANDARD OF REVIEW

Defendants and Plaintiff have filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact

sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

That the parties have filed cross-motions for summary judgment does not alter the Court's standard of review. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions."). Thus, in reviewing cross-motions for summary judgment, the Court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### III. DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims against them based on qualified immunity and generally that they are entitled to judgment in their favor. Plaintiff has failed to respond to a number of Defendants' arguments and instead focuses on the excessive force claim, the challenge to Licking County's use of force policy and the *Monell* claim.[1] The Court will first evaluate whether Defendants are entitled to qualified immunity and then move to the remaining arguments.

---

[1] The Court need not address the merits of Plaintiff's other claims as they are deemed abandoned. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (plaintiff deemed to abandon claim by failing to address the claim in response to a motion for summary judgment). Judgment is therefore granted in Defendants' favor on Plaintiff's claims that he was deprived due process of law, that he was falsely arrested, that he was subject to an unlawful taking, all claims against the Licking County and Coshocton County Defendants other than the challenge to Licking County's use of force policy; and the alleged violations of the Ohio Constitution.

**A.     Qualified Immunity**

Defendants assert that Deputies Stetson, Mills, and Zwiebel are entitled to qualified immunity on Plaintiff's § 1983 claims against them. They assert that they did not violate any of Plaintiff's constitutionally protected rights and are therefore entitled to summary judgment on the issue of qualified immunity. Plaintiff asserts, however, that the defense of qualified immunity does not protect the Defendants from liability.

Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Conn v. Gabbert*, 525 U.S. 286, 290 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow*, 457 U.S. at 806)).

The Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)) (emphasis in original). "[C]ategorical references to 'Defendants'" do not meet this standard. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596–97 (6th Cir. 2012). Nor do allegations that an individual defendant "was present and perhaps involved in [the plaintiff's] restraint," without allegations as to the unconstitutionality of the individual defendant's actions. *Lanman*, 529 F.3d at 684.

The Court must apply a two-step test to determine whether qualified immunity protects a government official. *Conn*, 526 U.S. at 290; *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1358 (6th

Cir. 1996). The first step is to determine whether a violation of a clearly established constitutional right has occurred. *Conn* 526 U.S. at 290; *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). If a constitutional violation is found, the second step is to determine whether an objectively reasonable public official in the circumstances would have recognized that his conduct violated the clearly established constitutional right. *Conn*, 526 U.S. at 290; *Buchanan*, 99 F.3d at 1358; *Dickerson*, 101 F.3d at 1158.

To be clearly established at the time of the conduct in question, the constitutional right must have been recognized by the United States Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits. *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996); *Dickerson*, 101 F.3d at 1158. "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right." *Sheets*, 97 F.3d at 166. "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### 1. Constitutional Violation

Plaintiff asserts that Defendants violated his Constitutional rights because they lacked probable cause to arrest him and he had a right to be free from physical force when he was not resisting arrest.

#### a. Probable Cause

Probable cause exists if "the facts and circumstances within [the officer's] knowledge and of which [he/she] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Diamond v. Howd*, 288 F.3d 932, 936 (6th Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The burden is on

a plaintiff bringing a Fourth Amendment claim to show the lack of probable cause. *Parsons v. City of Pontiac,* 533 F.3d 492, 500–01 (6th Cir. 2008); *see also Provience v. City of Detroit*, 529 F. App'x 661 (6th Cir. 2013).

In the case at bar, the deputies had probable cause to stop Plaintiff. As set forth in detail above, the deputies pursued Plaintiff based on an eye witness report that Plaintiff was driving erratically. Then, while en route, the deputies were advised that the driver was driving a stolen truck and was considered armed and dangerous. The Sixth Circuit has held that "[p]olice may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where it is a criminal offense." *United States v. Simpson*, 520 F.3d 531, 539 (6th Cir. 2008). Further, it is irrelevant that the truck was not actually stolen at the time Plaintiff was stopped because the officers were acting on reasonably trustworthy information that the truck was stolen. Accordingly, the Court finds that the deputies had sufficient probable cause to pull over Plaintiff and detain him.

Additionally, Defendants argue that to the extent Plaintiff is asserting claims for false or unlawful arrest, such a claim is barred by *Heck v. Humphey*, 512 U.S. 477 (1994). Under *Heck*, a § 1983 suit is not permitted if it would invalidate a plaintiff's conviction, unless the plaintiff can show the conviction has been set aside. *See Sanders v. Detroit Police Dep't*, 490 F. App'x 771 (6th Cir. 2012) (citing *Heck*, 512 U.S. at 487). Additionally, "[t]he existence of probable cause for an arrest totally precludes any section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution. …" *Watson v. City of Marysville*, 518 F. App'x 390 (6th Cir. 2013) (citing *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir. 1985).

Plaintiff pled guilty to an offense arising out of his arrest—obstructing official business. Therefore, Plaintiff's claims for unlawful search and seizure and false arrest must fail under *Heck*.

### b. Excessive Force

Claims regarding police officers' use of excessive force in the course of an arrest or other seizure are governed by the Fourth Amendment. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *See Graham*, 490 U.S. at 396. This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Id.* at 396. "[R]easonableness must be evaluated from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* Courts evaluating the reasonableness of force used "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

Plaintiff argues that the use of force in the case, administering the taser on him, was unreasonable and excessive. He acknowledges that the officers believed they were dealing with "an armed and drunk car thief." (Doc. 57, Pl.'s Mot. at 7). Plaintiff, however, submits that he was on his knees, his hands were in the air, and he was not resisting arrest.

Defendants counter that prior to Deputy Stetson deploying the taser, he believed:

> (1) Plaintiff was armed and dangerous; (2) he should proceed with caution; (3) Plaintiff was suspected of committing a serious crime, grand theft auto; (4) Plaintiff was suspected of operating a stolen vehicle, also a serious crime; (5) Plaintiff was likely under the influence of alcohol or another controlled substance. (Defs. Mot. for Summ. J. Doc 54-2 Stetson Aff. at 13; Doc 54-1 Green Aff. at 14; Ex. A at 20:31:30–20:31:56; Ex. B; Ex. P at 5-6).

(Doc. 60, Defs.' Reply at 4).

Plaintiff urges this Court to follow *Thomas v. Plummer*, 489 F. App'x 116 (6th Cir. 2012), arguing that the facts are exactly the same and the end result finding that the officers in this case, like those in *Plummer*, should not be entitled to qualified immunity. Defendants counter that the facts are very different. The plaintiff in *Plummer* was not suspected of committing any crime and was merely the passenger in the vehicle that was pulled over. The officers in *Plummer* were not warned that the suspect was armed and dangerous. Although the suspect in *Plummer* continued to ask "What did I do?" like Plaintiff in the case at bar, she did not verbally disobey the officer and say she was not going to comply.

In addition to distinguishing *Plummer*, Defendants reference a number of Sixth Circuit decisions that repeatedly found officers are entitled to qualified immunity when they deploy a taser to subdue a suspect who is fleeing arrest or otherwise resisting arrest. (Doc. 54, Defs.' Mot. at 16). *See Correa v. Simone*, No. 11-4441, 528 F. App'x 531, 535 (6th Cir. 2013) (noting that the Sixth Circuit has found that there is no clearly established constitutional right to be free from the use of a taser if the arrestee is actively resisting arrest); *Cockrell v. City of Columbus*, 468 F. App'x 491, 497 (6th Cir. 2012) (noting that in every case where a plaintiff was not fleeing or resisting arrest, federal courts denied qualified immunity to officers who deployed tasers, and in every case where a plaintiff was fleeing or resisting, federal courts found that qualified immunity was appropriate); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."). The following are some more examples of cases involving suspects who were stopped for a misdemeanor offense and then refused to comply with the officer's orders: *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (officer's use of

the taser gun to effectuate the arrest of the plaintiff was reasonably proportionate to the difficult, tense, and uncertain situation that the officer faced in the traffic stop and did not constitute excessive force); *Hinton v. Elwood*, 997 F.2d 774 (10th Cir. 1993) (use of force reasonable when plaintiff refused to talk to the police when they requested he stop, shoved the police when they tried to calm him down, and suffered deployment of the taser after considerable level of resistance); *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004) (suspect's repeated refusal to comply with the officer's requests and expressed intent to continue evading arrest qualified as resisting arrest and justified the application of non-lethal force); *Francis v. Pike Cnty.*, 708 F. Supp. 170 (S.D. Ohio 1988), aff'd 875 F.2d 863 (6th Cir. 1989) (use of stun gun to restrain an individual who resisted being handcuffed did not constitute excessive force).

The Court agrees with Defendants that *Plummer* is distinguishable. The Plaintiff in *Plummer* was not believed to be armed and dangerous and was ultimately charged with obstructing official business based on her conduct during the stop. She was told to get down on the ground, but instead just sank to her knees and held her hands above her head. "Officer Plummer screamed: "Get. Down. On. The. Ground. Or. You. Will. Be. Tased," walked behind Thomas, who was still kneeling with her hands above her head, and discharged his taser into her back." *Plummer*, 489 F. App'x at 118. The Sixth Circuit in *Plummer* held that when "Officer Plummer deployed his taser, Thomas posed absolutely no threat to his or any other officer's safety; nor did she offer any active resistance." *Id*. at 126. The Sixth Circuit then concluded that Officer Plummer's use of force was excessive and ultimately denied qualified immunity.

Notably, the Sixth Circuit in *Plummer* distinguished *McGee v. City of Cincinnati Police Dep't*, No. 1:06-cv-726, 2007 U.S. Dist. LEXIS 28665 (S.D. Ohio Apr. 18, 2007), which held that the officer's taser deployment was reasonable when McGee failed to comply with the officer's

orders and McGee could have been armed. *Plummer*, 489 F. App'x at 128. The *McGee* court stated:

> While ostensibly McGee only reached into his car to place his hat inside, the officers could not have know [sic] his motive at the time and could reasonably have suspected that McGee reached into the car to retrieve a weapon. Officer Rackley did not deploy his taser until after McGee failed to comply with instruction to get down on the ground and another officer shouted 'Check for a Gun. Gun. Gun.' Under the circumstances, a reasonable officer may have believed that McGee was indeed carrying a weapon and that the use of the taser was warranted to avoid potential violence.

*McGee*, 2007 U.S. Dist. LEXIS at *5.

In the case at bar, more like *McGee* than *Plummer*, Plaintiff did pose a threat to the officers' safety and was actively resisting arrest. Although some of the facts are similar to *Plummer* and some of the other cases cited by the parties, the distinguishing factor between the cases relied on by the parties is whether the suspect was resisting arrest therefore justifying the use of non-lethal force—deployment of the taser. Indeed, the Sixth Circuit has held that an individual has no clearly established constitutional right to be free from a police officer's use of a taser when the individual is actively resisting arrest. *See Hagans*, 695 F.3d at 509.

Notwithstanding the fact that Plaintiff was kneeling with his hands mostly in the air, he was verbally disobeying the officers and disobeyed the officer when he reached toward his truck. At no time did Plaintiff completely submit and stop actively resisting the officer's efforts to subdue and arrest him. The Court finds that a reasonable officer would consider this active resistance, especially in the short duration of the incident. The officers had to subdue the suspect as quickly a possible.

Based on the aforementioned standards, the Court concludes that Deputy Stetson's deployment of the taser on Plaintiff, was objectively reasonable and does not amount to excessive force in violation of the Fourth Amendment. The facts as told by both parties and confirmed with

the video evidence, show that the deputies believed they were approaching an armed and dangerous criminal who was driving erratically, suggesting he was under the influence of alcohol or drugs. That Plaintiff was not actually an armed and dangerous car thief does change the officers' reasonable belief that the stop required greater caution. Plaintiff was ordered to get down on the ground at least nine times and he refused. While Plaintiff was not brandishing a weapon, he was believed to be armed and dangerous and refusing to comply with Deputy Stetson's orders. Further, he attempted to reach toward his truck at one point. Deputy Stetson had reason to believe that Plaintiff posed a threat to himself and the other officers present. Plaintiff could have been reaching for a weapon. Plaintiff was also verbally resisting arrest, responding "NO" when ordered to get down on the ground. (*See* Ex. A (video) 20:31:30—20:31:56).

### c. Duty of the Other Officers

Plaintiff also argues that Deputies Mills and Zwiebel are also responsible for use of excessive force against Plaintiff because they breached their duty to protect him and failed to intervene. Defendants assert, and the Court agrees, that Plaintiff failed to plead this cause of action in his Complaint.

Even if this claim were properly before the Court, it still fails because the deputies did not owe Plaintiff a duty of protection, nor, as found above, did Deputy Stetson use excessive force to justify the need for protection. To prove such a duty of protection, Plaintiff must establish that the deputies "observed or had reason to know that excessive force would be or was being used' and 'had both the opportunity and the means to prevent the harm from occurring.'" *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In a similar situation, the Sixth Circuit has held that when an alleged act of excessive force occurs in a matter of seconds, a plaintiff is unable to establish that the officer had the opportunity and means

14

to prevent the harm from occurring. *See Pennington v. Terry*, 644 F. App'x 533, 548 (6th Cir. 2016) ("finding that nearby officers lacked a realistic opportunity to stop a tasing that occurred for a single, transitory moment"); *see also Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2013) (bystander officers not liable for failing to intervene because entire altercation lasted minutes and the use of the taser was a mere fraction of that time).

## 2. Clearly Established

If the Court were to have found that the Defendants violated any of Plaintiff's constitutional rights, then the next step would be to ask whether the right was "clearly established" in a particularized sense, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

There is no question that a reasonable officer in the same situation as any of the Defendants in this case, would have known that the there is a clearly established constitutional right to not be arrested without probable cause and to be free from excessive force. Thus, a reasonable officer would not have arrested Plaintiff unless he or she had probable cause to do so. Having found that probable cause did exist to pull over and detain Plaintiff, there was no violation of Plaintiff's clearly established constitutional rights.

Even if the Defendants did use unreasonable force in arresting Plaintiff by administering the taser, Defendants would nonetheless be entitled to qualified immunity because it has not been clearly established that the use of nonlethal force under these circumstances violates the Fourth Amendment. Generally speaking, the Fourth Amendment right to be free from excessive force in the context of a seizure is clearly established. *See Saucier,* 533 U.S. at 201-02; *Adams v. Metiva,* 31 F.3d 375, 386-387 (6th Cir. 1994); *Belford v. City of Akron,* No. 5:05cv2650, 2006 U.S. Dist. LEXIS 57704, 2006 WL 2381507, at *5 (N.D. Ohio Aug 16, 2006). However, the Supreme Court

15

has held that for the purposes of qualified immunity, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). In other words, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201.

Plaintiff generally asserts that the right to be free from physical force when one is not resisting the police was clearly established, relying on *Plummer*, 489 F. App'x at 126–27. The Sixth Circuit in *Plummer* concluded a reasonable officer would have understood that tasing a suspect on his knees with his hands above his head was excessive.

However, the Sixth Circuit recently admonished, "[i]n deciding whether a right has been clearly established, the Supreme Court has 'repeatedly' warned lower courts not to define the right at 'a high level of generality.'" *Hagans*, 695 F.3d at 508 (6th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. at 2084). The Sixth Circuit explained: "The general proposition" that the Fourth Amendment prohibits police officers from using excessive force "is of little help in determining whether the violative nature of [an officer's] particular conduct [was] clearly established." *al-Kidd*, 131 S. Ct. at 2084; *see also Saucier*, 533 U.S. at 201 (noting that the inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition").

Therefore, the more specific right as set forth by the Sixth Circuit is that an individual has no clearly established constitutional right to be free from a police officer's use of a taser when the individual is actively resisting arrest. *See Hagans*, 695 F.3d at 509; *Correa*, 528 F. App'x at 531.

16

As previously set forth, the evidence on the record shows that Plaintiff was actively resisting arrest and posed a threat to the officers who believed he was armed and dangerous. Therefore, the officers acted reasonably and are entitled to qualified immunity.

### 3. Objectively Reasonable Officer test

Even if the Court were to have found that Defendants did violate Plaintiff's clearly established constitutional rights, Plaintiff cannot establish that an objectively reasonable officer faced with the same circumstances as Defendants would have recognized that the conduct violated a clearly established constitutional right. The final test for qualified immunity is whether an objectively reasonable officer under the circumstances would have known that the officers' conduct violated the constitution in light of the preexisting law.

Considering the circumstances in this case—that a report was made that Plaintiff as driving erratically, that after the license plate was run through the system, the vehicle was reported stolen by someone considered armed and dangerous, that Plaintiff failed to comply with the officers' instructions and actively resisted by verbally refusing and reaching into his vehicle—then an objective officer faced with the same circumstances, who was trained in the laws and policies of Licking County and the State of Ohio, would recognize that probable cause did exist to pullover and arrest Plaintiff. An objective officer, just like Deputy Stetson in this case, would have recognized that Plaintiff posed a serious threat to himself and the other deputies on the scene and would want to detain Plaintiff as quickly as possible. The fact that Plaintiff was the actual owner of the car and was not the armed and dangerous car thief was not known to the deputies at the time.

Accordingly, the arrest of Plaintiff and the use of the taser were not a violation of Plaintiff's clearly established constitutional rights. Detectives Stetson, Mills, and Zwiebel are therefore

entitled to qualified immunity on Plaintiff's claims stemming from the arrest and use of force in this case.

**B.** *Monell*

Plaintiff has generally brought claims against Defendants Licking County and Coshocton County, Sheriff Thorpe and Sheriff Rogers, and the Sheriff Deputies in their official capacity. The claims that appear to have been brought against these Defendants include failure to train, inadequate supervision, and unconstitutional custom or practice. Defendants move for summary judgment on Plaintiff's municipal liability claims under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The *Monell* decision made clear that local government units could be held liable for § 1983 claims, but that "§ 1983 did not support *respondeat superior* liability, reasoning that 'Congress did not intend municipalities [and other local government units] to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Monell*, 436 U.S. at 691). A plaintiff can identify one of four methods "[t]o show the existence of a municipal policy or custom leading to the alleged violation:" "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1381 (2016) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

"A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 692–94). "In other

words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Id.* (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 412 (1997)).

Plaintiff must "identify the policy, connect the policy to the [county] itself and show that the particular injury was incurred because of the execution of that policy." *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994). Plaintiff must show that there is a direct causal link between Licking County's policy and the alleged constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Despite naming all of the aforementioned Defendants in the Complaint, his Motion for Summary Judgment, and subsequent briefing, Plaintiff has abandoned all the official claims except for one—Licking County's use of force policy is unconstitutional. Defendants are entitled to summary judgment on all of the claims and the Court will consider the remaining claim against Licking County.

Plaintiff concedes that this is not a case where the officers went rogue, "[r]ather, they did exactly what they were supposed to do—they followed their "Use of Force" policy to the letter." (Doc. 57, Pl.'s Mot. at 15). Licking County's taser policy states: "Personal weapons or empty-hand self-defense is encouraged after verbal orders/warnings have been ignored. (Doc. 57-2, Section 1.3.4). Plaintiff asserts that this policy on its face violates clearly established Sixth Circuit case law. Plaintiff states that the "Officers were not just permitted, but '***encouraged***,' to use tasers when confronted with 'passive resistance'—i.e. noncompliance with verbal instructions." (Doc. 57, Pl.'s Mot. at 15) (emphasis in original).

The Court agrees that the risk of this policy is that an officer is empowered to use personal weapons, including a taser, stun devices, and expandable batons, when the suspect is ignoring

19

verbal orders/warnings, rather than when a suspect actually posed an immediate threat to the officer's safety or the safety of others. However, in this case, the Court has already found that Plaintiff posed a potential threat to the officers involved. The officers had to make a split-second decision when faced with a suspect who was becoming increasingly agitated and defiant. The officers were forewarned that the suspect was armed and dangerous. Plaintiff repeatedly ignored the officers' warnings. There was a threat that the suspect could have a weapon, or obtained a weapon nearby. In short, The officers had reason to believe the situation could have escalated quickly. Plaintiff's claim that Licking County's use of force policy is unconstitutional must fail because the Court held that no constitutional violations occurred. Accordingly, Defendants are entitled to summary judgment on Plaintiff claim that Licking County's use of force is unconstitutional and all other claims related to Licking County and Coshocton County's policies, customs, or practices.

## IV.　　CONCLUSION

For the foregoing reasons, Defendants Licking County, Licking County Sheriff's Office, Coshocton County, Coshocton County Sheriff's Office, Randy Thorp, Michael Zwiebel, Brian Stetson, Jessica Mills, and Timothy Rogers' Motion for Summary Judgment (Doc. 54) is **GRANTED** and Plaintiff Ty Shanaberg's Motion for Summary Judgment (Doc. 57) is **DENIED**.

The Clerk shall remove Documents 54 and 57 from the Court's pending motions list and enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　 */s/ George C. Smith*　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　**GEORGE C. SMITH, JUDGE**
　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT COURT**